# In the United States Court of Federal Claims

No. 19-1246
Filed: December 7, 2020

|  |  |  |
|---|---|---|
| FLETCHER, et al., | ) | Tribal Trust; Native American Trust |
|  | ) | Management; Tucker Act; 28 U.S.C. § |
| Plaintiffs, | ) | 1491; Indian Tucker Act; 28 U.S.C. § |
|  | ) | 1505; Motion to Dismiss; RCFC 12(b)(1); |
| v. | ) | Subject Matter Jurisdiction; RCFC |
|  | ) | 12(b)(6); Standing; Issue Preclusion; |
| THE UNITED STATES, | ) | RCFC 12(e); Motion to Strike; RCFC |
|  | ) | 12(f). |
| Defendant. | ) |  |
|  | ) |  |

*Jason Bjorn Aamodt*, Indian and Environmental Law Group, LLC, Tulsa, OK, for plaintiffs.

*Sara E. Costello*, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, for defendant.

## OPINION AND ORDER

***SMITH*, Senior Judge**

This action is before the Court on defendant's Motion to Dismiss pursuant to Rules 12(b)(1), 12(b)(6), and 12(e) of the Rules of the Court of Federal Claims ("RCFC"), and on defendant's Motion to Strike pursuant to RCFC 12(f). On August 21, 2019, plaintiffs filed their Complaint with this Court, seeking "monetary restitution" for defendant's "gross mismanagement of the Osage Headright Trust fund." Complaint at 1–2 [hereinafter Compl.]. On December 20, 2019, defendant filed its Motion to Dismiss, arguing the following: (1) plaintiffs do not have a legally protectable interest to support standing; (2) this Court lacks jurisdiction over plaintiffs' claims under the Indian Tucker Act, the Tucker Act, and other authorities identified in plaintiffs' Complaint; and (3) plaintiffs' claims are barred by the doctrine of issue preclusion. United States' Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim upon Which Relief Can Be Granted at 1–2, ECF No. 7 [hereinafter Def.'s MTD]. For the reasons set forth below, the Court grants both defendant's Motion to Dismiss and defendant's Motion to Strike.

## I.    Background

### A.    Historical Facts

Under Article I of the United States Constitution, Congress possesses the plenary power to "regulate Commerce with foreign nations, and among the several states, and with the Indian Tribes." U.S. Const. art. I, § 8. In 1872, Congress established a reservation for the Osage Tribe

of Indians ("Osage Tribe" or "Osage Nation")[1] in the Oklahoma Territory, *Osage Nation v. Irby*, 597 F.3d 1117, 1120 (10th Cir. 2010), which "contained about a million and a half acres of fertile well-watered prairie land and of heavily timbered hill lands, largely underlaid with petroleum, natural gas, coal and other minerals." *McCurdy v. United States*, 246 U.S. 263, 265 (1918). Once the federal government discovered the resources beneath the Osage lands, it designated itself trustee in order to collect and distribute royalty payments to tribal members. *Fletcher v. United States*, 730 F.3d 1206, 1207 (10th Cir. 2013) ("*Fletcher II*").

In furtherance of this trust scheme, Congress passed the Osage Allotment Act of 1906 which "severed the mineral estate underlying Osage lands [('Osage Mineral Estate')] from the surface estate, placed the mineral estate in trust, [and] directed the Secretary of Interior to collect [and distribute] royalties," with interest, to individual members of the Osage Tribe on a quarterly, pro rata basis. *Id.*; *see also* Act for the Division of the Lands and Funds of the Osage Indians in Oklahoma Territory, and for other Purposes, Pub. L. No. 59-321 §§ 3–4, 34 Stat. 539, 543–44 (1906) [hereinafter 1906 Act].

Specifically, Section Three of the 1906 Act, severed the Osage Mineral Estate from the surface estate, reserving "the oil, gas, coal, or other minerals" for the Osage Nation. 1906 Act § 3. Section Three allows the Osage Tribe to lease the Osage Mineral Estate for oil, gas, and mineral development with the approval of the Secretary of the Interior, provided that royalties are paid to the Osage Tribe under any mineral lease as determined by the President of the United States. *Id.* Section Four of the 1906 Act establishes the trust ("Osage Tribal Trust Account") relationship between the United States and the Osage Tribe. *See id.* § 4. Section 4 details that the funds of the Osage tribe "shall be segregated" and "placed to the credit of the individual members of the [] Osage tribe on a [pro rata basis with] division among the members of [the] tribe."[2] *Id.* Funds from the Osage Tribal Trust Account are distributed to headright owners by direct check or, more likely, distributions made to Individual Indian Money ("IIM") accounts. [3] *Fletcher v. United States*, 153 F. Supp. 3d 1354, 1356 (N.D. Okla. 2015) ("*Fletcher I*"). "An IIM account is 'an interest bearing account for trust funds held by the Secretary that belong to a

---

[1]    As defined in the *Osage* Settlement Agreement, the "Osage Tribe" is identified as the Osage Tribe of Indians of Oklahoma, the tribal government established under the 1906 Act, which is now federally recognized as the "Osage Nation." United States' Motion to Strike the Declarations of Jim Gray and Wilson Pipestem, ECF No. 15 [hereinafter Def.'s Mot. to Strike], Exhibit ("Ex.") 1 at 6 [hereinafter *Osage* Settlement Agreement]; *see also Osage Nation v. United States*, 57 Fed. Cl. 392, 393 (2003) ("*Osage I*").

[2]    Congress created an official tribal role to determine who qualified as a tribal member for purposes of receiving an interest in the mineral estate. *Fletcher v. United States*, 730 F.3d 1206, 1207 (10th Cir. 2013). As time went on tribal members sold, gave away, or bequeathed their royalty interest (known as "headrights") or portions thereof which resulted in non-tribal members owning a headright in the Osage mineral estate. *Id.* at 1208. As a result, Congress limited this practice, of assigning headrights to non-tribal members, through legislative amendments. *Id.*

[3]    A "headright" is defined as "the right to a distribution of a portion of the proceeds of the Osage Mineral Estate, as provided by the 1906 Act and the tribal roll created pursuant to the 1906 Act." *Osage* Settlement Agreement at 5. A "headright holder" is "the lawful owner of any interest in any Headright, including fractional interests." *Id.*

person who has an interest in trust assets.'" *Id.* (citing 25 C.F.R. § 115.002). Individual headright owners may withdraw funds from their IIM accounts to access their money.

In summary, the United States places funds derived from the Osage Mineral Estate into the Osage Tribal Trust Account, which is later segregated and placed into IIM accounts, as a means of distribution to headright owners. *See* 1906 Act § 4. Sections Three and Four of the 1906 Act obligate the United States to hold in trust and, consequently, manage all mineral royalties received on behalf of the Osage Tribe. *See* 1906 Act §§ 3–4.

## B.    Prior Related Litigation

In 2000, the Osage Nation filed a separate complaint with this Court, asserting that the United States breached its fiduciary duties to the Osage Nation "in the mismanagement of tribal trust funds and for failure to account." *Osage Nation v. United States*, 57 Fed. Cl. 392, 393 (2003) ("*Osage I*"). On October 14, 2011, after years of litigation, the parties executed a settlement agreement to resolve that case. *See* United States' Motion to Strike the Declarations of Jim Gray and Wilson Pipestem, ECF No. 15 [hereinafter Def.'s Mot. to Strike], Ex. 1 [hereinafter *Osage* Settlement Agreement]. The *Osage* Settlement Agreement, among other terms and resolutions, resulted in the payment of $380,000,000.00, of which $345,800,000.00 was deposited into the Osage Tribal Trust Account. *Osage* Settlement Agreement at 9. The *Osage* Settlement Agreement expressly waived and released any and all of the Osage Nation's claims and/or liabilities "based on harms or violations . . . that relate to the Osage Tribe's monetary or non-monetary trust assets or resources that have been or could have been asserted by the Osage Tribe on behalf of itself and/or the [h]eadright [h]olders on or before September 30, 2011." *Id.* at 10. Additionally, Section Eleven, paragraph g of the *Osage* Settlement Agreement expressly prohibits the "Osage Tribe, its officers or employees, including the Osage Minerals Council . . . [from] aid[ing], assist[ing], or support[ing] in any way any individual or party in the development, initiation, or litigation of a claim against the United States that the Osage Tribe has otherwise waived in this Agreement." *Id.* at 24–25.

In 2002, plaintiffs originally brought a complaint in the Northern District of Oklahoma ("District Court") over "tribal voting rights of non-headright-owning Osage Indians" which later evolved into a complaint concerning the federal government's "allegedly wrongful distribution of Osage royalty income to non-Osages and its failure to account to the headright owners." *Fletcher I*, 153 F. Supp. 3d at 1357–58. The federal government moved to dismiss plaintiffs' accounting claim, *inter alia*, because it argued that there was no trust relationship between the federal government and headright owners. *Id.* The District Court held that "the 1906 Act created a limited trust relationship between the federal government and the Osage headright owners" which "only took effect upon distribution [to the headright owners] and that, prior to distribution, royalty funds were held in trust for the Osage Nation only." *Id.* The District Court held that, based on this limited trust relationship, plaintiffs could not seek an accounting. *Id.* The United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") reversed the District Court, holding that plaintiffs could seek an accounting. *Fletcher II*, 730 F. 3d at 1209–10 (holding that the trust funds collected and disbursed under the 1906 Act for the benefit of individual Osage tribal members indicates that "Congress has chosen to afford individual tribal members the statutory right to seek and obtain an accounting.").

On remand, the District Court used its discretion to determine the nature and scope of the accounting due to plaintiffs. *Fletcher I*, 153 F. Supp. 3d at 1360. After the District Court determined the scope and time period of the accounting, plaintiffs challenged that ruling, arguing that the accounting should go back to 1906, instead of 2002, and that the government should give a "more detailed accounting." *Fletcher v. United States*, 854 F.3d 1201, 1204–05 (10th Cir. 2017) ("*Fletcher III*"). The Tenth Circuit held that the District Court did not abuse its discretion in determining the time period or scope of accounting. *Id*. Regarding the time period, the Tenth Circuit stated that "district courts must be reasonable, not punitive, when sitting in equity, and requiring the government to sift through more than 100 years of records does not achieve the balance we envisioned in *Fletcher II*." *Id*. at 1206 (citing *Fletcher II*, 730 F.3d at 1214). As to the scope of accounting, the Tenth Circuit stated that it was bound by *Fletcher II*, and a duty to account is not the same as a "duty to respond to and disprove any and all potential breaches of fiduciary duty a beneficiary might wish to pursue once the accounting information is in hand." *Id*. (citing *Fletcher II*, 730 F.3d at 1215). Accordingly, the Tenth Circuit affirmed the District Court's holding. *Id*. at 1207.

C.    **Current Litigation**

On December 20, 2019, defendant filed its Motion to Dismiss with this Court, arguing that plaintiffs lack standing, that the Indian Tucker Act does not provide this Court with jurisdiction over plaintiffs' claims, and that plaintiffs' claims are barred by the doctrines of claim preclusion, issue preclusion, waiver, and release. Def.'s MTD at 1–2. Defendant additionally contends that plaintiffs "failed to identify any money-mandating statutory or regulatory trust duties" that the United States owes to plaintiffs. *Id*. at 2. In the alternative, defendant claims that plaintiffs "should be required to make a more definite statement pursuant to RCFC 12(e)," as plaintiffs' Complaint is "vague and ambiguous." *Id*. at 2, 44.

On February 18, 2020, plaintiffs filed their Response to defendant's Motion to Dismiss, asserting, *inter alia*, that the Court does have jurisdiction over this matter, that plaintiffs do have standing, and that the prior accounting action in the Northern District of Oklahoma does not limit the scope of remedy in this matter. *See* Plaintiffs' Response in Opposition to United States' Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim upon Which Relief Can Be Granted at 1–2, ECF No. 10 [hereinafter Pls.' Resp. to Def.'s MTD]. Among the exhibits attached to plaintiffs' Response are the Declarations of Jim Gray and Wilson Pipestem. *See id*. Ex. 5 [hereinafter Gray Decl.], 7 [hereinafter Pipestem Decl.]. On March 30, 2020, defendant filed its Reply, reiterating its arguments in support of its Motion to Dismiss. *See* United States' Reply Brief in Support of Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim upon Which Relief Can Be Granted, ECF No. 16 [hereinafter Def.'s Reply in Supp. of MTD].

On March 30, 2020, defendant filed a motion to strike both the declaration of Jim Gray, the former Principal Chief of the Osage Nation, and the declaration of Wilson Pipestem,[4] the

---

[4]    As lead counsel, Wilson Pipestem was involved in the final eight years of the eleven-year litigation in the previous *Osage* litigation, which began in 2000. He was involved in "every meaningful settlement discussion with the United States." *See* Plaintiffs' Response in

former lead counsel in the previous litigation[5] before this Court between the Osage Nation and the United States. Def.'s Mot. to Strike at 2–3. In 2011, the previous *Osage* litigation resulted in a comprehensive settlement agreement, which waived and released all of the Osage Nation's trust claims. *Id.* at 1. In its Motion to Strike, defendant asks the Court to strike both declarations, as they are "in violation of the [*Osage*] Settlement [Agreement], include legal conclusions, and are unhelpful to the Court." *Id.* On April 14, 2020, plaintiffs filed their Response, arguing that the Court should not strike the declarations, as they do not violate the *Osage* Settlement Agreement and because the declarations provide factual—not legal—conclusions. *See* Plaintiffs' Response in Opposition to United States' Motion to Strike the Declarations of Jim Gray and Wilson Pipestem at 2, ECF No. 17 [hereinafter Pls.' Resp. to Def.'s Mot. to Strike]. On April 20, 2020, defendant filed its Reply, reiterating its arguments in support of its Motion to Strike and further alleging that plaintiffs both misconstrued and failed to address defendant's arguments therein. United States' Reply in Support of Motion to Strike the Declarations of Jim Gray and Wilson Pipestem at 1, ECF No. 18 [hereinafter Def.'s Reply in Supp. of Mot. to Strike]. The Court held oral argument on June 3, 2020, and both defendant's Motion to Dismiss and Motion to Strike are fully briefed and ripe for review.

In summary, plaintiffs seek monetary restitution for defendant's "breach of statutorily-imposed trust obligations" including the following allegations: the defendant failed to (1) provide adequate systems and controls for accounting for and reporting trust fund balances; (2) establish written policies and procedures or provide adequate staffing, supervision, and training for trust fund management and accounting; and (3) provide accurate periodic statements of headright owners' accounts. Comp. at 23–26. As a result, plaintiffs claim that defendant breached its fiduciary obligations and mismanaged plaintiffs' money. *Id.* at 26.

## II.    Standard of Review

In determining whether subject matter jurisdiction exists, the Court will treat factual allegations in a complaint as true and will construe them in the light most favorable to the plaintiff. *Estes Express Lines v. United States*, 739 F.3d 689, 692 (Fed. Cir. 2014) (citing *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d. 1573, 1583–84 (Fed. Cir. 1993)). When a party challenges whether this Court possesses subject matter jurisdiction, the plaintiff must establish, by a preponderance of the evidence, that this Court has jurisdiction over its claims. *See Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011) (citing *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988)). In reviewing such a claim, the Court "must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Id.* (citing *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995)).

---

Opposition to United States' Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim upon Which Relief Can Be Granted, Ex. 7 at 1 [hereinafter Pls.' Resp. to Def.'s MTD].

[5]    The previous *Osage* litigation commenced in 2000 when the Osage Nation filed a complaint with this Court, asserting that the United States breached its fiduciary duties to the Osage Nation and mismanaged both the Osage Mineral Estate and the Osage Tribal Trust Account. *Osage I*, 57 Fed. Cl. at 393.

The Court will dismiss a case pursuant to RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." *Spectre Corp. v. United States*, 132 Fed. Cl. 626, 628 (2017) (quoting *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002)). In reviewing a motion to dismiss for failure to state a claim upon which relief may be granted, the Court "must accept as true all the factual allegations in the complaint . . . and we must indulge all reasonable inferences in favor of the non-movant." *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (internal citations omitted). The Court need not, however, "accept legal conclusions cast in the form of factual allegations," *Akins v. United States*, 82 Fed. Cl. 619, 622 (2008) (citing *Kowal v. MCI Commc'ns. Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)), and the Court will grant a motion to dismiss when faced with conclusory allegations that lack supporting facts, as "a formulaic recitation of the elements of a cause of action" alone will not withstand a motion to dismiss. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007).

## III. Discussion

### A. Motion to Strike

In their Response to the Motion to Dismiss, plaintiffs attached the declarations of Jim Gray and Wilson Pipestem to support their argument that that the *Osage* Settlement Agreement "would not affect Plaintiffs' claims." Pls.' Resp. to Def.'s MTD at 19 (citing Gray Decl.; Pipestem Decl.). In its Motion to Strike, defendant argues that the declarations of Jim Gray and Wilson Pipestem should be stricken, as "they are in violation of the *Osage* Settlement [Agreement], include legal conclusions, and are not helpful to the Court." Def.'s Mot. to Strike at 3. In support of its first argument—that the declarations violate the *Osage* Settlement Agreement—defendant quotes the No Cooperation Clause from that Agreement, which states, in relevant part, the following:

> **No Cooperation.**  The Osage Tribe, its officers or its employees, or the Osage Minerals Council, shall not aid, assist, or support in any way any individual or party in the development, initiation, or litigation of a claim against the United States that the Osage Tribe has otherwise waived in this Agreement, including in the form of sharing evidence, documents, materials, or other information the Osage Tribe, their counsel, consultants, experts, or contractors possess relating to the claims in the CFC Action.

*Osage* Settlement Agreement at 24–25. Plaintiffs claim that, because they were not parties to the *Osage* Settlement Agreement, the No Cooperation Clause does not apply. *Id.* at 8. Furthermore, plaintiffs contend that the No Cooperation Clause is unenforceable here because the declarations are not "being offered to present testimony on some confidential aspect of the [*Osage*] [S]ettlement [A]greement" but, rather, simply provide "narrow testimony regarding the scope of waiver . . . and whether the contracting parties intended to waive the claims of non-parties to the Settlement." *Id.* at 9–10.

As "Mr. Gray 'served as the Principal Chief of the Osage Nation from 2002 to 2010,'" a position which the Osage Nation Constitution vests with "'the supreme executive power of the Osage Nation,'" defendant asserts that, consistent with the meaning of the No Cooperation

Clause, Mr. Gray qualifies as an officer.  Def.'s Reply in Supp. of Mot. to Strike at 3 (first quoting Gray Decl. at 1; and then quoting Osage Const. art. VII, § 1).  "Officer" is defined by Black's Law Dictionary as "[s]omeone who holds an office of trust, authority, or command. [] In public affairs, the term usually refers esp. to a person holding public office under a national, state, or local government, and authorized by that government to exercise some specific function."  *Officer*, Black's Law Dictionary (11th ed. 2019).  Therefore, as the Principal Chief, Mr. Gray was clearly an officer of the Osage Tribe for the purposes of the No Cooperation Clause.

Next, defendant contends that, given Mr. Pipestem's position as "lead counsel for the Osage Nation for the final eight years of the eleven-year litigation" before this Court, and consistent with both the meaning of the No Cooperation Clause and Black's Law Dictionary's definitions of an agent and an employee, Mr. Pipestem "acted as an agent and/or employee of the Osage Nation."  *See* Def.'s Mot. to Strike at 3 (quoting Pipestem Decl. at 1); Def.'s Reply in Supp. of Mot. to Strike at 3–4 (first citing Pipestem Decl. at 1; then citing *Agent,* Black's Law Dictionary (11th ed. 2019); and then citing *Employee,* Black's Law Dictionary (11th ed. 2019)).  "Agent" is defined by Black's Law Dictionary as "[s]omeone who is authorized to act for or in place of another; a representative []."  *Agent*, Black's Law Dictionary (11th ed. 2019).  "Employee" is defined by Black's Law Dictionary as "[s]omeone who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance."  *Employee*, Black's Law Dictionary (11th ed. 2019).  As lead counsel for the Osage Tribe, Mr. Pipestem both was "authorized to act for" the tribe and worked "in the service of" the tribe "under an express" contract.  *See Agent*, Black's Law Dictionary (11th ed. 2019); *see also Employee*, Black's Law Dictionary (11th ed. 2019).  Therefore, Mr. Pipestem was clearly an agent or employee of the Osage Tribe for the purposes of the No Cooperation Clause.

"When contract language is unambiguous, the plain language of the contract is controlling."  *BPLW Architects & Eng'rs, Inc. v. United States*, 106 Fed. Cl. 521, 537 (2012) (citing *Bristol-Myers Squibb Co. v. United States*, 48 Fed. Cl. 350, 355 (2000)).  The Federal Circuit has stated that "[a] contract is ambiguous only when it is susceptible to two reasonable interpretations."  *Hunt Const. Grp., Inc. v. United States*, 281 F.3d 1369, 1372 (Fed. Cir. 2002) (quoting *A-Transport Northwest Co. v. United States*, 36 F.2d 1576, 1584 (Fed. Cir. 1994)).  The Federal Circuit continued by stating that "[w]hen the contract language is unambiguous on its face, [the Court's] inquiry ends, and the plain language of the contract controls."  *Hunt*, 281 F.3d at 1373.  The No Cooperation Clause clearly states that officers, employees, or the Osage Tribe itself shall not aid, assist, or support any individual or party from attempting to raise claims which are waived by the *Osage* Settlement Agreement.  *See Osage* Settlement Agreement at 24–25.  The No Cooperation Clause is unambiguous, and therefore the plain language of the contract is controlling.  As the No Cooperation Clause applies to both Mr. Gray and Mr. Pipestem, and, as both declarations were created to "aid, assist, or support in . . . the development, initiation, or litigation of a claim against the United States," *Id*. at 24–25, the Court must strike those declarations from the record.

B.        **Threshold Issues**

In their Complaint, plaintiffs allege that the United States breached its "statutorily-imposed trust obligations, which resulted in a loss of trust funds to Plaintiffs and to the putative class."  Compl. at 1.  Plaintiffs assert that this Court has jurisdiction pursuant to the Tucker Act, the Indian Tucker Act, the 1906 Act, "other acts of Congress set forth in Appendices A & B" of their Complaint, and "the Department of the Interior and Related Agencies Appropriations Act, Public Law No. 108-7 (herein the 'Appropriation Acts')."  *Id.* at 2–3.  Furthermore, plaintiffs contend that the "statutes and regulations defining Defendant's duties in managing Indian trust funds create specific fiduciary duties that provide for compensation for damages in the event of the breach of these duties."  *Id.* (citing *Jicarilla Apache Nation v. United States*, 100 Fed. Cl. 726, 738–39 (2011)).

In its Motion to Dismiss, defendant argues, *inter alia*, that plaintiffs' Complaint should be dismissed on the following jurisdictional grounds: (1) plaintiffs fail to establish that the Court has jurisdiction pursuant to the Indian Tucker Act, as plaintiffs are not an "identifiable group of Indians"; (2) plaintiffs lack standing, as they "cannot show that they have suffered an 'injury in fact' because they have not asserted a legally protected interest"; and (3) plaintiffs fail to "identif[y] any money-mandating statutory or regulatory trust duties" for the purpose of establishing jurisdiction under both the Tucker Act and the Indian Tucker Act.  *See* Def.'s MTD at 13–14, 33–43.  Additionally, defendant contends that issue preclusion bars plaintiffs from seeking an expanded accounting of the Osage Tribal Trust Account.  *Id.* at 26.

For the reasons more fully set forth below, the Court concludes the following: (1) plaintiffs lacks standing to bring their claims; (2) plaintiffs' claims lack subject matter jurisdiction under the Indian Tucker Act, Tucker Act, the 1906 Act, and other authorities identified by plaintiffs' Complaint; and (3) plaintiffs' request for an expanded accounting is barred by issue preclusion.

1.        **Standing**

In order to proceed with any litigation, the parties must demonstrate standing.  Whether a plaintiff has standing to pursue its claims is a "threshold jurisdictional issue."  *Myers Investigative & Sec. Servs. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102–04 (1998)).  "The party invoking federal jurisdiction bears the burden of establishing these elements", *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (citing *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990)), which the Supreme Court has held are the following:

(1) [plaintiff] has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Serv., Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan*, 504 U.S. at 560–61).

i.      *Injury-in-Fact*

Defendant argues that plaintiffs have not suffered an "injury in fact" because plaintiffs "have not asserted a legally protectable interest." *Id*. at 15.  Defendant points out that plaintiffs are bringing their claims in the context of the accounting they received under *Fletcher*.  *Id*. (citing Compl. ¶¶ 4, 50).  Defendant argues that because the accounting was for the Osage tribal trust account, "an account within the United States Treasury which holds Osage royalty income prior to its distribution to the headright owners," plaintiffs lack standing to seek damages regarding the management of the Osage Tribal Trust Account.  *Id*.  Defendant points out that the Osage Tribal Trust Account is "held for the benefit of the Osage Nation, not individual Tribe members or Osage headright holders."  *Id*.

Further, defendant argues that the distribution of communal assets through the tribe to recipients does not create an individual right on the part of the beneficiary.  *See id*. at 16 ("[T]he distribution of communal assets . . . does not create an individual right on the part of the beneficiary where the tribe is 'the channel or conduit through which reimbursement is to flow.'") (quoting *Chippewa Cree Tribe of Rocky Boy's Rsrv. v. United States*, 73 Fed. Cl. 154, 160 (2006)).  Defendant points to *Osage Tribe v. United States*, arguing "that [Osage] headright holders do not have a legally protectable interest in the Osage Tribal Trust Account."  *Id*. (citing *Osage Tribe of Indians v. United States*, 85 Fed. Cl. 162, 171–72 (2008) ("*Osage VI*")).  *Osage VI* held that headright holders are not a party to the trust relationship between the Osage Nation and the United States, and, as such, they "do not have a legally protectable interest in a dispute concerning a trust relationship to which they are not a party."  *Id*. at 17 (quoting *Osage VI*, 85 Fed. Cl. at 171–72).

The Court previously decided the issues underlying the case at bar through litigation of *Osage Tribe of Indians v. United States*, and, as such, it is inclined to follow that precedent. *Osage VI*, 85 Fed. Cl. 162 (stating that the "headright holders are not in fact 'the real parties in interest' because the Tribe, not the headright holders, is the direct trust beneficiary.") (quoting from *Osage I*, 57 Fed. Cl. at 395; *Osage Tribe of Indians of Okla. v. United States*, 81 Fed. Cl. 340, 349 (2008) ("Osage V")).  Under *Osage I*, this Court held that the "responsibility of the government is to the tribal trust fund account" with the "tribal trust fund [] then responsible for the ultimate distribution to the individual headright owners."  *Id*.  Accordingly, plaintiffs' claims regarding trust fund mismanagement are not appropriately asserted against the government because the government's responsibility to correctly distribute and manage funds is a fiduciary duty owed to the tribe—not individual tribal members.  *See id*.

Further, the "fact that the ultimate distribution of any funds awarded to the Osage Tribe will be placed to the credit of the headright holders does not in itself create a legal right enforceable in this action." *Osage VI*, 85 Fed. Cl. at 171.  This Court takes note of the decision reached by the Tenth Circuit, specifically—and as of yet exclusively—concerning the duty to account, the 1906 Act created a trust relationship between the federal government and the individual Osage headright owners.  *See Fletcher II*, 730 F.3d at 1209.  This Court interprets the merely persuasive decision of the Tenth Circuit narrowly and will not now judicially create additional fiduciary duties on the government beyond the contours of the specific accounting

articulated by the Tenth Circuit and the Northern District of Oklahoma.  *See Fletcher III*, 854 F.3d 1205–07; *see also Fletcher I*, 153 F. Supp. 3d at 1369–72.  Accordingly, the plaintiffs do not have an injury in fact and therefore do not have standing to bring their claims.

## 2.    Subject Matter Jurisdiction

The Tucker Act is only a jurisdictional statute and "does not create substantive rights enforceable against the United States for money damages."  *United States v. Mitchell*, 463 U.S. 206 (1983) ("*Mitchell II*") (quoting *United States v. Testan*, 424 U.S. 392, 398 (1976) (*superseded by statute,* Civil Service Reform Act of 1978, 5 U.S.C. § 5596 (b)(4))).  Plaintiffs "must identify a separate source of substantive law that creates the right to money damages" for their claim to come within the jurisdictional reach and waiver of the Tucker Act.  *Jan's Helicopter Serv. v. FAA*, 525 F.3d 1299 (Fed. Cir. 2008) (quoting *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc)).  Accordingly, a plaintiff has jurisdiction to bring its claim if the claim is for money damages against the United States and if plaintiff can "demonstrate that the source of substantive law he relies upon 'can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained.'"  *Id*. at 1306 (quoting *Mitchell II*, 463 U.S. at 216–17).  On the contrary, if "plaintiff's case does not fit within the scope of the [money-mandating] source . . . plaintiff loses on the merits for failing to state a claim on which relief can be granted."  *Id*. at 1307 (citing *Fisher*, 402 F.3d at 1175–76).

The Indian Tucker Act, similar to the Tucker Act, creates a limited waiver of sovereign immunity and states, in relevant part, the following:

> The United States Court of Federal Claims shall have jurisdiction of any claim against the United States accruing after August 13, 1946, in favor of any tribe, band, or other identifiable group of American Indians . . . whenever such claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band, or group.

28 U.S.C. § 1505 (2018); *see United States v. Navajo Nation*, 556 U.S. 287, 289–90 (2009) ("*Navajo II*").  The Supreme Court has held that the Indian Tucker Act, much like the Tucker Act, does not "create[] substantive rights," but, rather, it is a "jurisdictional provision[] that operate[s] to waive sovereign immunity for claims premised on other sources of law (*e.g.*, statutes or contracts)."  *Navajo II*, 556 U.S. at 290 (citing *Testan*, 424 U.S. at 400; *United States v. Mitchell*, 445 U.S. 535, 538 (1980) ("*Mitchell I*")).  Importantly, the courts have made clear that "[n]ot every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act," and by extension the Indian Tucker Act; rather, a plaintiff must bring a claim for money damages against the United States and "demonstrate that the source of substantive law he relies upon 'can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained.'"  *Mitchell II*, 463 U.S. at 216–17 (citing *Testan*, 424 U.S. at 400).

Plaintiffs bear the burden of establishing subject matter jurisdiction.  *See Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (citing *McNutt v. Gen. Motors*

*Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936)).  If the facts upon which jurisdiction is predicated are challenged, the plaintiffs must demonstrate the existence of a factual basis for jurisdiction by a preponderance of the evidence.  *Reynolds*, 846 F.2d at 748; *McNutt*, 298 U.S. at 189.  The Court must dismiss the action if it determines at any time that subject matter jurisdiction is lacking.  *See* R. Ct. Fed. Cl. 12(h)(3).

    i.  *The Indian Tucker Act*

  As the Court iterated above, the Indian Tucker Act is a jurisdictional statute that "authorizes this court to hear claims brought by any 'tribe, band, or other identifiable group of American Indians.'"  *Osage VI*, 85 Fed. Cl. at 167; *see Rosebud Sioux Tribe v. United States*, 102 Fed. Cl. 429, 432 (2011); *see also Navajo II*, 556 U.S. at 290 (2009) (citing *Testan*, 424 U.S. at 400; *Mitchell I*, 445 U.S. at 538).  Thus, for plaintiffs to bring a claim under the Indian Tucker Act, they must qualify as an "identifiable group of American Indians" pursuant to 28 U.S.C. § 1505.

  Plaintiffs in this case include William Fletcher, Tara Damron, and Kathryn Red Corn, who are, individually, Osage Headright Owners and citizens of the Osage Nation, as well as Richard J. Lonsinger, an Osage Headright Owner and citizen of the Ponca Tribe of Indians of Oklahoma.  Compl. at 4.  Plaintiffs state that the "Putative Class Members are Osage Headright Owners and citizens of more than one federally-recognized Indian tribe."  *Id.*  In its Motion to Dismiss, defendant argues that the Court does not have jurisdiction over plaintiffs' claims pursuant to the Indian Tucker Act, as plaintiffs "are not a 'tribe, band, or other identifiable group of American Indians.'"  Def.'s MTD at 33.  In support of that argument, defendant asserts that this Court's decision in *Osage* "held that the [Osage] headright holders were not an 'identifiable group' of Indians," because they are members of the Osage Tribe, and are different from other claimant groups that are "not represented by tribes who could establish jurisdiction on their own."  *Id.* at 33–34 (quoting *Osage VI*, 85 Fed. Cl. at 167–68).  As such, defendant contends that plaintiffs, as Osage Headright Owners, are "members of the Osage Nation, which has already brought claims challenging the government's management of the Osage tribal resources at issue."  *Id.* at 34.  Accordingly, defendant argues that, "[b]ecause plaintiffs are not a tribe, band, or other identifiable group of Indians, this Court lacks jurisdiction under 28 U.S.C. § 1505."  *Id.*

  In their Response, plaintiffs claim that they are an identifiable group of American Indians, as "many persons who have headrights are not Osage, but are Indian," including plaintiff Lonsinger, who is a member of the Ponca Tribe of Indians of Oklahoma.  Pls.' Resp. to Def.'s MTD at 25.  As such, plaintiffs contend that the current and putative "Plaintiffs represent a cross section of the identifiable group of American Indians who each hold a headright."  *Id.*  Plaintiffs argue that "courts should take a liberal viewpoint in determining whether a plaintiff is an 'identifiable group of American Indians,'" as the *Chippewa* decision "noted how [the] determination of [an] 'identifiable group' required a more limited showing of formal relationship than that required for a tribe or band.'"  *Id.* at 26 (quoting *Chippewa*, 69 Fed. Cl. at 673) (internal citation omitted).  Against this backdrop, plaintiffs contend that they are an identifiable group "due to the way the United States has administered their trust by granting them 'shares' in the royalty production of the Osage Mineral Estate."  *Id.* (citing Compl. ¶ 54).

Here, plaintiffs fail to identify any legal authority or case in which this Court has held that members of a currently-existing tribe, when supplemented by a single member of another tribe, constitutes an "identifiable group of American Indians" in accordance with the Indian Tucker Act.  Further, the Court's review of relevant case law, including *Osage VI*, leads it to conclude that plaintiffs are not in fact an identifiable group of American Indians.  *See Osage VI*, 85 Fed. Cl. 162.  In *Osage VI*, this Court held that intervenors, individual members of the Osage Tribe, were not considered an "identifiable group" for purposes of the Indian Tucker Act because the proposed intervenors did not lack formal organization as a tribe.  *Id*. at 168 ("Proposed intervenors do not lack formal organization as a tribe but are members of plaintiff[s'] tribe, the Osage Nation.").  Similarly, the Osage Tribe represents the plaintiffs' interests here as its constituents.  *See id*.

While the requirement to bring a claim under the Indian Tucker Act is not predicated on "particular tribal citizenship," previous case law has repeatedly shown that plaintiffs are considered an "identifiable group of American Indians" when they are unable to sue as a tribe or there is no existing tribal organization in which plaintiffs can assert their claims.  *See Chippewa*, 69 Fed. Cl. at 673–74; *see also Wolfchild v. United States*, Fed. Cl. 521, 539–40 (2004); *Snoqualmie Tribe of Indians v. United States*, 372 F.2d 951, 956–57 (1967).  Here, plaintiffs are able to sue as a tribe and there is an existing tribal organization, the Osage Nation, which represents plaintiffs' interests.  Therefore, the Court does not find that plaintiffs are an "identifiable group of American Indians" in light of the precedent for the Indian Tucker Act.

As plaintiffs must prove by a preponderance of evidence that this Court has jurisdiction over its case, *see Reynolds*, 846 F.2d at 748, plaintiffs in this case have failed to do so with respect to the Indian Tucker Act; therefore, the Court must review plaintiffs' claims pursuant to the Tucker Act, the 1906 Act, and any other authority plaintiffs articulated in their Complaint to determine whether plaintiffs' claims fall within the jurisdiction of 28 U.S.C. § 1491(a)(1).

> ii.     *The Tucker Act, the 1906 Act, and Other Authorities*

In order to invoke jurisdiction, a plaintiff must clear the following two hurdles: (1) "the tribe 'must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties,'" and (2) "the court must then determine whether the relevant source of substantive law 'can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties [the governing law] impose[s].'"  *Navajo II*, 556 U.S. at 290–91 (citing *Navajo I*, 537 U.S. at 506).  If "plaintiff's case does not fit within the scope of the [money-mandating] source . . . plaintiff loses on the merits for failing to state a claim on which relief can be granted."  *Id.* at 1307 (citing *Fisher*, 402 F.3d at 1175–76).

The Supreme Court in *Mitchell I* and *Mitchell II* set forth the framework for determining whether a duty and, particularly, a fiduciary duty is established in statute, regulation or contract. *Mitchell I*, 445 U.S. 535; *Mitchell II*, 463 U.S. 206.  Under *Mitchell I*, the Court held that the "General Allotment Act does not confer a right to recover money damages against the United States" because the Act created a limited trust relationship which did not "impose any fiduciary management duties or render the United States answerable for breach thereof."  *Mitchell II*, 463

U.S. at 217–18 (citing from *Mitchell I*, 445 U.S. at 544). Conversely, in *Mitchell II*, "the statutes and regulations [] clearly give the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians" and "thereby establish[es] a fiduciary relationship and define[s] the contours of the Unites States' fiduciary responsibilities." *Id*. at 224. Importantly, the Supreme Court noted in *Mitchell II* that "a fiduciary relationship necessarily arises when the Government assumes such elaborate control over forests and property belonging to Indians" and where all of the "elements of a common-law trust are present: a trustee (the United States), a beneficiary (the Indian allottees), and the trust corpus (Indian timber, lands, and funds). *Id*. at 225.

In its Motion to Dismiss, defendant contends that the Court lacks Tucker Act jurisdiction over plaintiffs' claims, as plaintiffs do not identify a substantive source of law that establishes fiduciary trust duties that the government owes plaintiffs or that requires compensation in the event such a duty is breached. Def.'s MTD at 34. Further, defendant argues that, even if plaintiffs identified a potential money-mandating statutory or regulatory trust duty, plaintiffs fail to "allege with specificity what portions of those statutes or regulations establish the duty or how exactly the United States breached that duty." *Id*. at 34–35. Finally, defendant argues that it is "[p]laintiffs' burden to demonstrate that their claim is based on 'specific rights-creating or duty imposing statutory or regulatory prescriptions.'" *Id*. at 43 (quoting *Navajo II*, 556 U.S. 287) (internal citation omitted).

In response, Plaintiff argues that the 1906 Act imposes an obligation on the federal government to distribute money to individual headright owners quarterly and on a pro rata basis, with interest. Pls.' Resp. to Def.'s MTD at 29. Plaintiffs argue that the United States' mismanagement in making payments to headright holders resulted in losses that were only discovered under the Court-ordered accounting in *Fletcher*. *Id*. In its Reply, defendant argues that "ownership of a headright does not create a trust relationship between headright holders and the United States with respect to management of the Osage Mineral Estate or the Tribal Trust Account." *Id*. at 18. Moreover, defendant argues that all of plaintiffs' claims pertain to "pre distribution activities occurring while the funds are in the Osage Tribal Trust Account," so the plaintiffs cannot rely on fiduciary duties owed, if any, to the Tribe. *Id*. at 18–19.

This Court is inclined to agree with defendant's argument that plaintiffs have not identified with specificity a separate source of substantive law that establishes a fiduciary trust duty that the government owes plaintiffs or that requires compensation if such a duty is breached. In fact, plaintiffs list several statutes, regulations, and manuals to convey the existence of such a duty, but plaintiffs fail to provide this Court with a specific reason as to how these authorities impose a duty upon the defendant that defendant breached. *See* Compl. at 2–3; *see also* Compl., Appendices A & B. Additionally, while the Tenth Circuit in *Fletcher II* imposed a limited fiduciary duty on the federal government to account to headright owners as beneficiaries, this Court interprets that duty to account narrowly and will not now impose additional judicially created duties beyond those which the Tenth Circuit found.

Assuming that plaintiffs could identify a specific fiduciary duty owed by defendant, and assuming plaintiff actually alleged that the defendant breached that duty, this Court would still have difficulty interpreting any of plaintiffs' identified statutes, regulations, or manuals as

mandating compensation for damages sustained as a result of such a breach. In other words, even if plaintiffs could clear the first hurdle and invoke jurisdiction, plaintiffs have not identified a relevant source of substantive law that can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of defendant's duties.

Furthermore, the existence of a trust relationship between the United States and a group of Indians or a tribe does not automatically convey "money-mandating" responsibilities upon the government. *Compare Mitchell II*, 463 U.S. at 225 (holding that the United States was subject to suit for damages because the timber management statutes show that the Government assumed "elaborate control over forests and property belonging to Indians" and "[a]ll of the necessary elements of a common-law trust are present.") *with Samish Indian Nation v. United States*, 657 F.3d 1330, 1337 (Fed. Cir. 2011) (*judgment vacated on other grounds*, 568 U.S. 936, 937 (2012)) (holding that the Samish have not invoked a money-mandating statute when the "network of statutes underlying the TPA system" did not convey the "level of detail necessary to establish a fiduciary relationship beyond the general trust relationship between the Government and the tribes." (citing *United States v. Jicarilla Apache Nation*, 131 S. Ct. 2313 (2011))). If "plaintiff[s'] case does not fit within the scope of the [money-mandating] source . . . plaintiff loses on the merits for failing to state a claim on which relief can be granted." *Id.* at 1307 (citing *Fisher*, 402 F.3d at 1175–76). Accordingly, plaintiffs' claims do not fall within the jurisdiction of 28 U.S.C. § 1491(a)(1)—the Tucker Act—because plaintiffs have not identified a substantive source of law that imposes a specific fiduciary duty on the government and that the government breached, and plaintiffs have not identified a relevant source of substantive law that the Court can interpret as mandating compensation as a result of such a breach. Nonetheless, the Court need not delve into this issue further as plaintiffs' claims cannot survive issue preclusion.

### 3. Issue Preclusion

In its Motion to Dismiss, defendant asserts that issue preclusion bars plaintiffs from relitigating their claims for an expanded accounting of the Osage Tribal Trust Account. Def.'s MTD at 19. Defendant argues that plaintiffs are seeking to relitigate the scope of the government's accounting of the Osage Tribal Trust Account "despite this issue having been argued and decided by the *Fletcher* district court and affirmed by the Tenth Circuit." *Id.* (citing *Fletcher I*, 153 F. Supp. 3d at 1372; *Fletcher III*, 854 F.3d at 1205–07). Defendant further claims that, because plaintiffs previously litigated this issue before the Tenth Circuit, this Court must apply the law of the Tenth Circuit on issue preclusion and find that plaintiffs' claim for an expanded accounting is barred. Def.'s MTD at 26 (citing *Dana v. E.S. Originals, Inc.*, 342 F.3d 1320, 1323 (Fed. Cir. 2003)).

In their Response, plaintiffs claim that "[t]here is nothing about the prequel *Fletcher* litigation that should limit Plaintiffs' claims in this action." Pls.' Resp. to Def.'s MTD at 2. Plaintiffs state that "the limits of the previous accounting were limited to specific pleadings of the Northern District of Oklahoma, and do not relate to the specific finding that may be a part of Plaintiffs' damage award here," and, therefore, the government's argument is "simply misplaced." *Id.* at 12–13. In other words, plaintiffs believe that the *Fletcher III* holding, which limited the time period and scope of the accounting, has no bearing on the damages that may be assessed from the accounting sought in this case. *See id.* Plaintiffs point to *Shoshone Indian*

*Tribe of the Wind River Reservation v. United States* to support their asserted right to amend their pleadings to more accurately reflect the harm suffered. Pls.' Resp. to Def.'s MTD at 32–33 (citing *Shoshone Indian Tribe of the Wind River Rsrv. v. United States*, 71 Fed. Cl. 172, 177 (2006)) ("[T]his Court permitted the Shoshone Tribe to amend its claims to include claims prior to 1946 when the 'Defendant acknowledges that 'claims for mismanagement of certain trust fund monies . . . may be allowable for periods pre-dating 1946.'"). As the accounting claims within the prior *Fletcher* litigation were based on a more conservative litigation approach, plaintiffs argue that this Court should apply the holding in *Shoshone* and allow plaintiffs' claims for an expanded accounting "merely adjunct to their claim for damages" that includes years prior to 2002. *See id.*

In its Reply, the defendant reiterates its argument that plaintiffs' claim for an expanded accounting is barred by issue preclusion. Def.'s Reply in Supp. of MTD at 8. Defendant further reasons that, simply the fact that "Plaintiffs are now pursuing monetary damages from the United States does not mean that Plaintiffs can once again litigate the scope of accounting they are entitled to, when this issue was adjudicated in *Fletcher.*" *Id.* at 10 (citing *Park Lake Res. Ltd. Liab. Co. v. USDA*, 378 F.3d 1132, 1135–36 (10th Cir. 2004)). Further, defendant asserts that plaintiffs' reliance on *Shoshone* is misplaced and "offers no support for Plaintiffs' attempt to evade issue preclusion," as the *Shoshone* plaintiff sought to amend its complaint, not to relitigate a previously resolved claim. *Id.*

The Supreme Court has explained that collateral estoppel, or issue preclusion, "like the related doctrine of *res judicata*, has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 (1979). When resolving procedural issues not unique to this Court's exclusive jurisdiction, the Federal Circuit has held that the law of the relevant regional circuit must be applied. *Dana*, 342 F.3d at 1323 (citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 807 (Fed. Cir. 1999)); *see also Jones v. United States*, 122 Fed. Cl. 490, 524 (2015) (overturned on other grounds). Thus, because plaintiffs previously litigated this issue before the Tenth Circuit, the Court must now utilize the Tenth Circuit's application of issue preclusion, which analyzes whether the following elements are present:

> (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

*Moss v. Kopp*, 559 F.3d 1155, 1161 (10th Cir. 2009) (citing *Frandsen v. Westinghouse Corp.*, 46 F.3d 975, 978 (10th Cir. 1995)). The Tenth Circuit has routinely held that all four elements must be met for issue preclusion to apply. *See Stan Lee Media, Inc. v. Walt Disney Co.*, 774 F.3d 1292, 1297–98 (10th Cir. 2014); *see also Park Lake Res. Ltd. Liab. v. U.S. Dept. of Agric.*, 378 F.3d 1132, 1136 (10th Cir. 2004); *Coffey v. Dean Witter Reynolds Inc.*, 961 F.2d 922, 925 (10th Cir. 1992). The Court will analyze each of these elements in turn.

Under the first element of issue preclusion, this Court must determine whether the issues previously decided—those in the line of *Fletcher* cases—are identical to the issues being presented by the plaintiffs in this action. Plaintiffs allege that "a review of documents older than 2002, those not produced as part of the time-limited accounting, will show additional under-collection of interest by Defendant." Compl. at 24. Plaintiffs claim that "an accounting will need to be performed to determine the breadth of the United States' liability for its mismanagement of Plaintiffs' trust funds." Pls.' Resp. to Def.'s MTD at 12. Plaintiffs acknowledge that they filed an action before the Oklahoma District Court seeking, *inter alia*, an accounting related to the trust fund at issue in this matter. *Id*. at 14–15. The Oklahoma District Court determined that the time period and scope of the government's accounting obligations—later affirmed through *Fletcher III* and imposed in order to provide an accounting of royalty income from oil and gas reserves held in trust—started from the "first quarter of 2002 until the last available quarter." *Fletcher I*, 153 F. Supp. 3d at 1372; *see also Fletcher III*, 854 F.3d 1201.[6] Plaintiffs appealed the Oklahoma District Court's decision, challenging the District Court's determination that the time period of the accounting should begin in 2002 and arguing that the accounting instead should "go back to 1906 (when headrights were created) as opposed to 2002 (when the litigation started)" and that the government should "give a more detailed accounting." *Fletcher III*, 854 F.3d at 1204–05. The Tenth Circuit affirmed the lower court's decision regarding the scope and time period of the accounting, with the trust accounting to begin in the first quarter of 2002—not 1906—because the accounting need only provide "some sense of where money has come from and gone to." *Id*. at 1205–07 (quoting *Fletcher II*, 730 F.3d at 1215).

Additionally, plaintiffs argue that, because the Court allowed the Tribe in *Shoshone* to amend its pleadings, the Court should now permit plaintiffs to seek an expanded accounting. Pls.' Resp. to Def.'s MTD at 32–33; *see Shoshone*, 71 Fed. Cl. at 177. However, defendant asserts that the holding in *Shoshone* is inapplicable because *Shoshone* "did not address whether the parties had already litigated the proposed claims and thus the amendments would be barred by issue preclusion." Def.'s Reply in Supp. of MTD at 10. The Court agrees with defendant's argument that *Shoshone* is inapplicable to the facts of this case. *Shoshone* did not deal with an amendment to a complaint from previously decided litigation, nor did *Shoshone* provide any clarity on whether issue preclusion would bar that action. *See Shoshone*, 71 Fed. Cl. 172. As

---

[6]     The exact scope of the accounting articulated by the Oklahoma District Court was as follows:

[A] description of each receipt and distribution for the relevant accounting period. In particular, the accounting must include the following information: the date and dollar amount of each receipt and distribution; a brief description of the source of each trust receipt; the name of the beneficiary to whom each trust distribution was made; for headright distributions, the respective headright share of each headright owner at the time of distribution; and finally the amount of interest income generated from the tribal trust account and the date at which such interest was credited to the account.

*Fletcher v. United States*, 153 F. Supp. 3d 1354, 1371 (N.D. Okla. 2015).

such, this Court concludes that plaintiffs' claims for an expanded accounting is identical to the issue decided and affirmed by the Tenth Circuit in *Fletcher III*, and, therefore, the first element of issue preclusion is met. *See Fletcher III*, 854 F.3d 1201.

Under the second element of issue preclusion, the Court looks to whether the prior litigation has been finally adjudicated on the merits. *Moss*, 559 F.3d at 1161; *see Jones v. United States*, 846 F.3d 1343, 1361 (Fed. Cir. 2017). The Federal Circuit has held that prior adjudications are considered final when they are "sufficiently firm to be accorded conclusive effect." *Dana*, 342 F.3d at 1323 (citing *Restatement (Second) of Judgments* § 13 (1982)). "The test for finality is whether the prior decision was 'adequately deliberated and firm' or 'avowedly tentative,' and whether the parties were fully heard in the prior proceeding." *Id*. In *Fletcher I*, the District Court found that plaintiffs first asserted their accounting claim in 2006. *Fletcher I*, 153 F. Supp. 3d at 1358. The District Court based its determination that the Osage Tribal Trust accounting should begin in 2002 on nearly nine years of litigation. *See id*. at 1370. That decision was affirmed by the Tenth Circuit on appeal a year and a half later. *Fletcher III*, 854 F.3d at 1205–07. Therefore, for purposes of issue preclusion, the decision from the Tenth Circuit affirming the time period and scope of accounting should be considered a final adjudication on the merits.

Under the third element of issue preclusion, plaintiffs functionally acknowledge that, they were a party to or in privity with a party to the prior adjudication. *See* Compl. 14–17. In their Complaint, plaintiffs state that "Plaintiffs filed an action in the United States District Court for the Northern District of Oklahoma in 2002 seeking, *inter alia*, an accounting for the money handled by Defendant under Defendant's trust responsibility created under Section 4 of the 1906 Act." *Id*. at 14. Plaintiffs note that both parties appealed the Oklahoma District Court's decision that the government provide accounting starting from 2002, and that the Tenth Circuit affirmed the District Court's holding. *See id*. at 17 (citing to *Fletcher I*, 153 F. Supp. 3d at 1372; *Fletcher III*, 854 F.3d at 1206). Additionally, plaintiffs do not contest that they are the same plaintiffs as those in the Tenth Circuit *Fletcher* litigation. *See* Pls.' Resp. to Def.'s MTD. The Court therefore determines that the plaintiffs here are the same party as those in the prior adjudication, and the third element of issue preclusion is met.

The fourth element of issue preclusion asks whether the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action. *Dana*, 342 F.3d at 1323. In determining whether a party had a full and fair opportunity to litigate an issue, the Tenth Circuit looks to "whether there were significant procedural limitations in the prior proceeding, whether the party had the incentive to litigate fully the issue, or whether effective litigation was limited by the nature or relationship of the parties." *Burrell v. Armijo*, 456 F.3d 1159, 1172 (10th Cir. 2006) (quoting *Murdock v. UTE Indian Tribe of Uintah & Rsrv.*, 975 F.2d 683, 689 (10th Cir. 1992) (internal citation omitted)). In prior *Fletcher* proceedings, plaintiffs filed their Complaint with the Oklahoma District Court in 2002. *Fletcher v. United States*, No. 02-CV-427-GKF-FHM, 2012 U.S. Dist. LEXIS 46390, at *1–2 (N.D. Okla. Mar. 31, 2012). Plaintiffs first asserted their accounting claim in 2006 as part of their First Amended Complaint. *Fletcher I*, 153 F. Supp. 3d at 1358. After the District Court determined that the accounting should begin in 2002, plaintiffs appealed to the Tenth Circuit, which upheld the District Court's accounting determination. *See Fletcher III*, 854 F.3d 1201. As the parties engaged in fifteen

years of litigation and appeals to the Tenth Circuit on this issue, the Court finds that plaintiffs had a full and fair opportunity to litigate the time period and scope of the accounting.

The Court concludes that all four elements of issue preclusion have been met, and, thus, plaintiffs are estopped from relitigating the time and scope of the accounting before this Court. Additionally, as the Court found that it lacks subject matter jurisdiction over this matter, that plaintiffs lack standing to pursue their claims, and that plaintiffs are barred from seeking an expanded accounting, the defendant's motions must be granted.

**IV.   Conclusion**

For the foregoing reasons, defendant's MOTION to Strike is **GRANTED**.  Accordingly, the declarations of Jim Gray and Wilson Pipestem are hereby **STRICKEN** from the record. Additionally, defendant's MOTION to Dismiss is **GRANTED**.  Plaintiffs' claims are accordingly **DISMISSED** pursuant to RCFC 12(b)(1) and 12(b)(6).  Finally, as plaintiffs' claims have been dismissed, the request for class certification in plaintiffs' Complaint is hereby **found MOOT**.  The Clerk is directed to enter judgment consistent with this Opinion and Order.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,
Senior Judge