# In the United States Court of Federal Claims

No. 19-1246
Filed: August 5, 2025

|  |  |
|---|---|
| WILLIAM FLETCHER, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| THE UNITED STATES, | ) ) |
| Defendant. | ) ) ) |

*Jason Bjorn Aamodt*, Indian and Environmental Law Group, LLC, Tulsa, OK, for plaintiffs.

*Sara E. Costello* and *Anthony P. Hoang*, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, for defendant.

**OPINION AND ORDER**

*SMITH*, **Senior Judge**

When "settlers displaced the Osage Nation from its native lands" more than a century ago, "the federal government shunted the tribe onto the open prairie in Indian Territory"—only to discover that the land contained "mammoth reserves of oil and gas." *Fletcher v. United States* ("*Fletcher 2013*"), 730 F.3d 1206, 1207 (10th Cir. 2013) (Gorsuch, J.). In response, the federal government "appropriated for itself," back in 1906, "the role of trustee, overseeing the collection of royalty income and its distribution" to persons entitled to a share of the proceeds of the Osage mineral estate, known as "headright holders" or "headright owners." *Id.* The government did not do a very good job, however—in past litigation, courts have ruled that the government violated the law by failing to provide an accounting of the trust funds for over a century, and that it breached at least some fiduciary duties. *See Fletcher v. United States* ("*Fletcher 2015*"), 153 F. Supp. 3d 1354, 1368 (N.D. Okla. 2015), *aff'd*, 854 F.3d 1201 (10th Cir. 2017); *Osage Tribe of Indians of Oklahoma v. United States* ("*Osage 2006*"), 72 Fed. Cl. 629 *passim* (2006).

The government has, however, paid for the breach, at least in part. Per a 2011 settlement agreement with the Osage Nation, the government paid $345,800,000.00 to headright owners. In return, the Osage Nation—acting on behalf of itself and the headright holders—settled, waived, or released all claims that related to the mismanagement of trust funds before September 30, 2011, and could have been brought before that date ("pre-settlement claims"). The Osage Nation also conditionally waived most of its—but not the headright holders'—future claims ("post-settlement claims").

In this suit, four headright holders of Osage descent ("Osage headright holders" or "Osage headright owners"), acting on behalf of the putative class of all Osage headright holders, seek damages from the federal government for mismanagement of the trust funds. The Court initially held that (1) individual headright owners lacked standing to sue, and (2) the Court lacked subject matter jurisdiction over their claims. *Fletcher v. United States* ("*Fletcher 2020*"), 151 Fed. Cl. 487, 496–502 (2020). The Federal Circuit reversed. *Fletcher v. United States* ("*Fletcher 2022*"), 26 F.4th 1314, 1317–18 (Fed. Cir. 2022).

Before the Court now is the government's renewed motion to dismiss on several grounds. First, the government contends under Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC") that the settlement agreement bars plaintiffs' pre-settlement claims. The Court agrees and **GRANTS** this portion of the motion. Second, the government argues under RCFC 12(b)(7) and 19 that even the post-settlement claims cannot proceed in the absence of the Osage Nation, a sovereign immune from joinder. The Court **DENIES** this part of the motion. Finally, the government asks the Court to either dismiss the suit under RCFC 12(b)(6) for failure to identify specific fiduciary duties that the government breached, or direct plaintiffs per RCFC 12(e) to file a more definite statement of the allegations. The Court **DENIES** this part of the motion as well.

I.   **Background and Procedural History**

Several courts have recounted the factual backdrop and litigation history in this case and related cases.[1] The Court therefore recounts only the facts and legal background relevant to the disposition of the instant motion.

A.   **The Osage Allotment Act of 1906**

In 1906, Congress enacted the Osage Allotment Act ("1906 Act"), Pub. L. No. 59-321, 34 Stat. 539, establishing how the federal government must manage "the oil, gas, coal, or other minerals" of the Osage reservation ("Mineral Estate"), and for whose benefit, *id.* § 1, 34 Stat. at 539. Beginning with the latter, all proceeds from the Mineral Estate were payable, after appropriate deductions, on a *pro rata* basis to the 2,229 members on the tribal roll in 1906. *See id.* § 1, 34 Stat. at 539–40; *Fletcher 2015*, 153 F. Supp. 3d at 1371. Each member's share is colloquially known as a headright. Through descent, devise, and assignment, there are now more than 5,000 headright owners entitled to receive a distribution of the royalties. *Fletcher 2013*, 730 F.3d at 1208 (citing Felix S. Cohen, Cohen's Handbook of Federal Indian Law § 4.07, at 304–08 (Nell Jessup Newton ed., 2012)); Compl. 21, ECF No. 1.

The authority to manage the Mineral Estate and the trust funds is divided between the Osage Nation and the United States, as follows: The Osage Nation leases the Mineral Estate for oil, gas, and mineral development (subject to approval by the Secretary of the Interior), and the federal government collects, manages, invests, and ultimately distributes the royalties to headright holders. 1906 Act § 3, 34 Stat. at 543. More specifically, the federal government first places "all funds belonging to the Osage tribe [now known as the Osage Nation]" in a dedicated

---

[1]   *See, e.g.*, *Fletcher 2022*, 26 F.4th at 1318–21; *Fletcher 2013*, 730 F.3d at 1207–08; *Fletcher 2020*, 151 Fed. Cl. at 491–95; *Osage Tribe of Indians of Oklahoma v. United States* ("*Osage 2005*"), 68 Fed. Cl. 322, 323 (2005).

tribal trust account ("Trust Account"). *Id.* § 4, 34 Stat. at 544. Then, at the time of distribution, the federal government: (1) sequesters funds within the Trust Account for distribution to individual headright holders; (2) deducts a portion to pay state production taxes and tribal operating expenses; and (3) distributes the net proceeds to headright holders, on a *pro rata* basis, by direct check or a deposit into each holder's Individual Indian Money ("IIM") account.[2] *Fletcher 2015*, 153 F. Supp. 3d at 1357. These distributions are made on a quarterly basis with interest. *Id.* at 1356; *see* 1906 Act § 4, 34 Stat. at 544.

### B.    The Osage Nation's Internal Organization

The 1906 Act vested all the authority to manage the Mineral Estate in the Osage tribal council, an eight-member body that also served as the tribe's legislature. 1906 Act §§ 3, 9, 34 Stat. at 543, 545. The Act provided that the electorate of the tribal council would consist of "legal members[]" of the tribe, *id.* §§ 1, 9, 34 Stat. at 540, 545, which the Commissioner of Indian Affairs determined created a one-headright-one-vote system, *see* 25 C.F.R. § 90.21 (2001). Under that system, Osage descendants who owned multiple headrights voted multiple times, while those without headrights were disenfranchised. *See Fletcher 2022*, 26 F.4th at 1320. Nearly a hundred years later, Congress fixed that problem by clarifying that a person could be a legal member of the Osage Nation even if they did not own headrights. Pub. L. No. 108-431 § 1(b)(1), 118 Stat. 2609, 2609 (Dec. 3, 2004). Congress also "reaffirm[ed] the inherent sovereign right of the Osage [Nation] to determine its own form of government." *Id.* § 1(b)(2), 118 Stat. at 2609.

Their right to manage their own affairs having been confirmed, the Osage Nation wrote a new constitution. In its current form, the Osage Constitution provides that all members of the Osage Nation may vote for a Principal Chief, who leads the Executive, and a Congress, which is vested with the general legislative powers.[3] Osage Nation Const. ("Osage Const.") arts. III, VI, VII. These branches "have the perpetual obligation to ensure the preservation of the Osage Mineral Estate" and must "further ensure" that "the rights of [headright] holders of Osage descent"—that is, Osage headright holders—"to income derived from the Mineral Estate are protected." *Id.* art. XV § 4.

The Nation's Congress, however, has "no legislative authority" to manage the Mineral Estate. *Id.* Instead, the Osage Constitution vests all of the tribe's powers under the 1906 Act in an "independent agency" known as the Osage Minerals Council ("Minerals Council"). *Id.* Unlike the rest of the Osage government, which is elected by citizens of the Nation, the Minerals Council is elected "[o]nly" by "Osage [headright] holders," which means headright holders of Osage descent. *Id.* Because the right to vote for the Minerals Council is tied to descent rather than citizenship, some Osage headright holders—like one named plaintiff in this case, Mr. Richard Longsinger—are not citizens of the Osage Nation. *See* Compl. 4.

---

[2]    An IIM account is "an interest bearing account for trust funds held by the Secretary that belong to a person who has an interest in trust assets." 25 C.F.R. § 115.002.

[3]    The new constitution also provides for a Judicial branch. Osage Const. art. VIII.

### C. Prior Litigation

This is the third lawsuit by the Osage Nation and/or Osage headright holders in relation to two distinct fiduciary duties of the federal government: (1) the duty to provide an accounting of the Trust Account and related accounts, and (2) the duty to manage Osage trust funds responsibly. The first lawsuit, *Osage Tribe of Indians of Oklahoma v. United States* (later known as *Osage Nation v. United States*), was brought by the Osage Nation in this Court in 2000. The Nation sought damages for breach of both duties. The suit concluded in 2011 with the Nation and the federal government executing a settlement agreement ("2011 Agreement" or "Agreement"). The second suit, *Fletcher v. United States*, was filed by Osage headright holders in 2002 in the federal district court for the Northern District of Oklahoma ("district court"). That suit related only to the government's duty to provide an accounting to Osage headright holders. It concluded in 2017 with a judgment against the federal government. The third lawsuit is the instant suit, and it commenced in 2019.

#### 1. The 2000 Osage Nation *litigation and 2011 settlement agreement*

Although federal law requires the United States to provide an accounting of Osage trust funds, *see* 25 U.S.C. § 4044, the Osage did not receive any accounting for most of the twentieth century. The first accounting "that could possibly comply with [federal law] was submitted to the [Osage Nation] on December 31, 1995." *Osage Nation v. United States* ("*Osage 2003*"), 57 Fed. Cl. 392, 397 (2003). On March 31, 2000, the Osage Nation sued in this Court seeking damages "for breach of fiduciary duty in the mismanagement of tribal trust funds and for failure to account." *Id.* at 393. The Court held that although the Nation owned only 1.25% of the total headrights, it had "both an interest in and a claim to" the entirety of the funds "when those funds are within the tribal trust account." *Id.* at 395. After further proceedings, our Court found that the United States mismanaged the Mineral Estate; under-collected royalties; failed to timely deposit them into the Trust Account; failed to properly maintain cash balances; and failed to obtain enough investment returns on the monies in the Trust Account. *Osage 2006*, 72 Fed. Cl. at 671. Of note, the Court did not allow headright holders to intervene in the litigation on the grounds that the Nation is the only party with a "legally protectable interest." *Osage Tribe of Indians of Oklahoma v. United States* ("*Osage 2008*"), 85 Fed. Cl. 162, 170 (2008) (quoting *American Maritime Transp., Inc. v. United States*, 870 F.2d 1559, 1561 (Fed. Cir. 1989)). The Court also held that the Osage Nation adequately protects the interests of Osage headright holders because the damages would be distributed to headright holders on a *pro rata* basis. *Id.* at 174–75.

The case eventually settled in 2011, with the United States agreeing to provide the Osage Nation an accounting of the Trust Account and several other Osage accounts, and pay $345,800,000.00, which would be transferred to headright holders on a *pro rata* basis without deductions for tribal expenses or state taxes. Agreement 9, ECF No. 30-1. In exchange, the Osage Nation expressly waived, "on behalf of itself and the [h]eadright [h]olders . . . any and all [trust-related] claims" that are "based on harms or violations occurring on or before September 30, 2011 . . . [and] that have been or could have been asserted by the Osage Tribe on behalf of itself and/or the [h]eadright [h]olders on or before September 30, 2011." *Id.* at 10. The agreement went on to enumerate several specific types of claims—more on that later. The

4

agreement was also vetted and voted upon by different branches of the Osage government, including the Minerals Council—more on that later as well. Finally, the Osage Nation also "conditionally" waived most of its own future claims. *Id.* at 17.

### 2. *The 2002* Fletcher *litigation and the 2017 accounting*

Roughly contemporaneously with the Nation's suit in our Court, individuals of Osage descent sued the federal government in the Northern District of Oklahoma. Their complaint, filed in 2002, initially sought to vindicate the "tribal voting rights of non-headright-owning Osage Indians" but later morphed into a suit for, *inter alia*, "failure to account to the headright owners." *Fletcher 2015*, 153 F. Supp. 3d at 1357–58. The district court—echoing this Court's opinion denying the headright holders leave to intervene in *Osage*—held that the right to an accounting belonged to the Osage Nation, not individual headright holders. *Fletcher v. United States* ("*Fletcher 2012*"), No. 02-CV-427-GKF-FHM, 2012 WL 1109090, at *7 (N.D. Okla. Mar. 31, 2012). In an opinion by then-Judge Gorsuch, a unanimous panel of the Tenth Circuit reversed, holding that "Congress has chosen to afford individual tribal members the statutory right to seek and obtain an accounting." *Fletcher 2013*, 730 F.3d at 1209–10. On remand, the district court entered judgment directing the federal government to provide an accounting beginning in 2002. *See Fletcher v. United States* ("*Fletcher 2017*"), 854 F.3d 1201, 1204–05 (10th Cir. 2017) (affirming *Fletcher 2015*).

The federal government complied in October 2017, when it provided headright owners with a quarterly accounting running from 2002 to 2017 ("2017 Accounting"). Compl. 17. The 2017 Accounting is the basis of the present lawsuit.

### D.     This Lawsuit

### 1. *Initial dismissal and appeal*

On August 21, 2019, plaintiffs brought this suit on behalf of themselves and a putative class of Osage headright holders seeking "monetary restitution for breach of statutorily-imposed trust obligations, which resulted in a loss of trust funds." Compl. 1, 4. The complaint attempts to distinguish the 2000 *Osage* litigation by clarifying that "the minerals of the Osage Nation are not a subject of this litigation." *Id.* at 20. Instead, plaintiffs' claims are based on "instances of mismanagement" that were either revealed in the 2017 Accounting, or may be revealed during discovery, if any. *Id.* In relevant part, plaintiffs seek damages for: mismanagement of funds after they are deposited in the Trust Account; providing inaccurate statements of plaintiffs' accounts; and general breach of fiduciary duties. *See id.* at 23–26.

The Court initially dismissed plaintiffs' claims for lack of subject-matter jurisdiction. *Fletcher 2020*, 151 Fed. Cl. 487 (2020), *rev'd*, 26 F.4th 1314 (Fed. Cir. 2022). In relevant part, the Court held—echoing the reasoning in *Osage 2008*—that we lacked Tucker Act jurisdiction because plaintiffs had not identified a "specific fiduciary duty" breached by the federal government and, alternatively, that Congress had not conferred a "money-mandating" cause of action on individual headright holders for breach of fiduciary duties. 151 Fed. Cl. at 501. The

5

Court interpreted the Tenth Circuit's ruling recognizing headright holders' right to an accounting "narrowly," and declined to extend it to the context of money damages. *Id.* at 497.

The Federal Circuit reversed in relevant part, holding that "individual headright owners have a trust relationship with the United States" for Tucker Act purposes. *Fletcher 2022*, 26 F.4th at 1322. Helpfully, the appeals court went further and defined the specific contours of the trust relationship. It rejected both the government's position that "headright owners have only a narrow interest in the actual distribution of headright payments" and the plaintiffs' position that "the tribe's interest is limited to the mineral estate and the leasing of it while the individual headright owners exclusively hold the right to the funds" in the Trust Account. *Id.* at 1322–23. Instead, headright holders and the Osage Nation have a concurrent "trust interest in the trust fund." *Id.* at 1323. The Federal Circuit based that conclusion in part on the 1906 Act, which repeatedly refers to the trust funds as "belonging to the Osage tribe." *Id.* at 1323 (quoting 1906 Act § 4, 34 Stat. at 544). On April 18, 2022, the Federal Circuit issued its mandate remanding the case for further proceedings. Mandate, ECF No. 26.

2.   *Proceedings on remand*

On August 26, 2022, the United States renewed its motion to dismiss, *see* Mot. Dismiss, ECF No. 30, citing three grounds for dismissal. First, plaintiffs' pre-settlement claims must be dismissed under Rule 12(b)(6) because those claims were either (a) settled, waived, or released by the Osage Nation under the 2011 Agreement, or (b) barred under the doctrine of claim preclusion as it relates to the same suit. *Id.* at 28–38. Second, the entire suit must be dismissed under Rules 12(b)(7) and 19 because the Osage Nation—a sovereign immune from joinder—is a required and indispensable party. *Id.* at 14–28. Third, the United States asks this Court to either dismiss the case under Rule 12(b)(6) for failure to allege breach of a specific fiduciary duty, or else direct plaintiffs to file a more definite statement under Rule 12(e). *Id.* at 38–40.

On October 7, 2022, plaintiffs filed their Response. Pls.' Resp. Mot. Dismiss, ECF No. 33 [hereinafter Resp.]. Plaintiffs address the government's arguments but also argue that the *Fletcher* district court has already decided that the 2011 Agreement does not bar plaintiffs' pre-settlement claims and that the Osage Nation is not a necessary and indispensable party. *Id.* at 7–16. These arguments are, thus, barred by issue preclusion in the plaintiffs' view.

On October 28, 2022, defendant filed its Reply. Def.'s Reply Supp. Mot. Dismiss, ECF No. 36 [hereinafter Reply]. On April 19, 2023, both parties filed supplemental briefs. Pls.' Suppl. Br., ECF No. 42; Def.'s Suppl. Br., ECF No. 43. The Court held oral argument, and now renders its decision.

II.  **Legal Standard**

   A.   **RCFC 12(b)(6)**

This Court dismisses a claim pursuant to RCFC 12(b)(6) if "the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). For purposes of a Rule 12(b)(6) motion, the Court "must accept as true all the

factual allegations in the complaint . . . and we must indulge all reasonable inferences in favor of the non-movant." *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (internal citations omitted). "The affirmative defenses of res judicata and collateral estoppel are also properly considered under a RCFC 12(b)(6) motion to dismiss." *Copar Pumice Co., Inc. v. United States*, 112 Fed. Cl. 515, 527 (2013); *see also Chisolm v. United States*, 82 Fed. Cl. 185, 193 (2008) (citing *Pactiv Corp. v. Dow Chem. Co.*, 449 F.3d 1227, 1229–34 (Fed. Cir. 2006)).

### B.     RCFC 12(b)(7) and 19

Rule 12(b)(7) provides for dismissal for "failure to join a party under RCFC 19." R. Ct. Fed. Cl. 12(b)(7). Under Rule 19, a "required party" must be joined "if [f]easible." *Id.* 19(a)(1). If joinder of a required party is "[n]ot [f]easible," the Court must "determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." *Id.* 19(b); *see also In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1372–73 (Fed. Cir. 1999).

### C.     RCFC 12(e)

Under Rule 12(e), the Court may, upon motion by a party responding to a pleading, direct the pleading party to file "a more definite statement of a pleading . . . which is so vague or ambiguous that the [movant] cannot reasonably prepare a response." R. Ct. Fed. Cl. 12(e). The motion "must point out the defects complained of and the details desired." *Id.* Rule 12(e) is "designed to remedy unintelligible pleadings, not to correct for lack of detail." *Brinkman v. United States*, 158 Fed. Cl. 282, 294 (2022) (quoting *Adams v. United States*, 151 Fed. Cl. 522, 529 (2020)). The remedy for lack of detail "is discovery, not a more definite statement." *Id.*

## III.    Discussion

### A.     The *Osage* Settlement Agreement Bars Plaintiffs' Pre-Settlement Claims

The federal government argues that plaintiffs' pre-settlement claims were waived, released, or settled under the 2011 Agreement between the Osage Nation and the United States. In response, plaintiffs present three defenses: (1) their claims are not among the claims waived in the 2011 Agreement, (2) issue preclusion bars defendant from arguing that the agreement binds plaintiffs because the *Fletcher* district court considered and rejected the same argument, and (3) the Osage Nation had no authority to bind plaintiffs.

The Court concludes that: (1) the Osage Nation attempted to release plaintiffs' pre-settlement claims in the Agreement, (2) issue preclusion does not apply because the issue brought here is materially different from the issue decided by the district court, and (3) plaintiffs adopted the Agreement and are therefore bound by it.

> 1. *The Osage Nation purported to release plaintiffs' pre-settlement claims in the settlement agreement*

As the Federal Circuit anticipated, the Court's first task is to construe which of plaintiffs' claims—"some or all"—are swept in by the "broad waiver provision" in the 2011 Agreement between the Osage Nation and the United States. *Fletcher 2022*, 26 F.4th at 1323. When construing the release clause in a settlement agreement, this Court looks to "the plain language of the release, and if the provisions are clear and unambiguous, the court must give it its plain and ordinary meaning." *H.J. Lyness Constr., Inc. v. United States*, 125 Fed. Cl. 387, 390 (2015); *accord McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1434 (Fed. Cir. 1996). "Any rights that the parties intended to reserve when executing a release must be expressly stated." *Info. Sys. & Networks Corp. v. United States*, 148 Fed. Cl. 356, 364 (2020) (alteration and citation omitted). The Court therefore begins with the text of the agreement. In relevant part, it states:

> [T]he Osage Tribe, on behalf of itself and the Headright Holders, hereby waives and releases . . . any and all claims . . . known or unknown, suspected or unsuspected, regardless of legal theory, for any damages, equitable or specific relief, that are based on harms or violations occurring on or before September 30, 2011, and that relate to the Osage Tribe's monetary or non-monetary trust assets or resources that have been or could have been asserted by the Osage Tribe on behalf of itself and/or the Headright Holders on or before September 30, 2011 . . . .

Agreement 10. The agreement goes on to enumerate several classes of claims, including:

> 1. all claims asserted, or that could have been asserted by the Osage Tribe in [*Osage*];
> 2. all claims regarding the United States' obligation to provide a historical accounting or reconciliation of the Osage Tribal Trust Account;
>    . . .
> 4. all claims regarding the United States' alleged mismanagement of the Osage Tribal Trust Account . . . up through and including September 30, 2011, including . . . any claim . . . that [the United States]:
>    a. failed to invest revenue in the Osage Tribal Trust Account . . . in a timely manner;
>    b. maintained excessive cash balances;
>    c. failed to obtain an appropriate return on funds;
>    d. failed to deposit monies into . . . or disburse monies from the Osage Tribal Trust Account . . . in a proper and timely manner.
>       . . .

*Id.* at 10, 12.

To distinguish their claims from those released in the clause reproduced above, plaintiffs previously argued that Paragraph 1—"all claims asserted, or that could have been asserted by the Osage Tribe" in *Osage*—should be construed to include only claims arising from mismanagement of the Mineral Estate, whereas this litigation is based on mismanagement of the Trust Account. Compl. 20. The Federal Circuit rejected that argument, noting that *Osage* involved both "issues that could be characterized as tied to the mineral estate (the failure to collect the highest posted price in royalties from leases)," and "issues that could be characterized as relating to the trust fund (the loss of interest due to a lag in the deposit of funds and investment underperformance of the funds)." *Fletcher 2022*, 26 F.4th at 1323 (relying in part on *Osage 2006*, 72 Fed. Cl. at 629).[4]

Plaintiffs now argue that the trust-fund claims in *Osage* related to management of "funds *coming into* the trust fund as a part of royalty collection" whereas plaintiffs' instant claims relate to "the distribution [of funds] *from* the Trust Account." Resp. 28 (emphasis in original). Put differently, whereas *Osage* related to the "under-collection of funds," plaintiffs' claims—which allege overpayment of state gross production taxes; "failure to collect interest on [funds] . . . segregated for distribution," and incorrect reporting of tribal operating expenses "to force the balancing of the account"—relate to the "underpayment of . . . funds after they were collected." *Id.* at 28–29.

Plaintiffs are correct that these specific claims were not actually litigated in *Osage*. However, that is not enough to win the day, because apart from settling the claims actually litigated by the Osage Nation, the Agreement also releases certain enumerated claims that "could have been asserted by the Osage Tribe." Agreement 9. Plaintiffs' briefs entirely fail to address which claims the Nation *could* have asserted and therefore concede the question.

In any case, the text is clear. The Agreement releases and waives "on behalf of . . . [h]eadright [h]olders," certain pre-settlement claims that "could have been asserted by the Osage Tribe on behalf of itself and/or the [h]eadright [h]olders." *Id.* at 9–10. Thus, the instant claims are covered if their substance is encompassed by the clause and the Osage Nation "could have" brought them in *Osage*. Both conditions are satisfied. First, plaintiffs' claims are expressly waived per paragraph 4.d, which covers "any" pre-settlement claim or allegation that defendant "failed to deposit monies into . . . *or disburse monies from*" the Trust Account "in a proper and timely manner . . . [or] without . . . proper authorization." *Id.* at 12 (emphasis added). Improper disbursement of monies—that is an apt description of plaintiffs' claims.

Second, plaintiffs' claims also "could have been asserted by the Osage Tribe." *Id.* at 10. As defendant points out, "plaintiffs' alleged injuries"—which, recall, relate to defendant's management of funds in the Trust Account just before distribution—"all occurred while [defendant] held the funds in the Osage Tribal Trust Account." Mot. Dismiss 37. Because the

---

[4] To be sure, in *Osage 2008*, our Court denied headright holders (including Mr. Fletcher) leave to intervene on the grounds that "the Osage Tribe is the [only] real party in interest" because "the Osage Tribe owns the *minerals which are the subject of the action*." 85 Fed. Cl. at 170 (emphasis added). The statement appears to have been a stray remark. *Compare with Osage 2006*, 72 Fed. Cl. at 629. In any case, *Fletcher 2022* clarified that *Osage 2008* got it wrong. 26 F.4th at 1323.

9

funds were still in the Trust Account, both headright owners and the Nation had an interest in the fund. *Fletcher 2022*, 26 F.4th at 1323; *see also* 1906 Act § 4, 34 Stat. at 544. It follows that the Osage Nation "could have" brought the pre-settlement claims plaintiffs bring now. Therefore, the 2011 Agreement reaches plaintiffs' pre-settlement claims.

### 2.  *Plaintiffs are bound by the 2011 settlement agreement*

Next, the Court addresses whether plaintiffs are bound by the settlement agreement between the Osage Nation and the United States. The Court first considers plaintiffs' argument that the *Fletcher* district court has already decided that the 2011 Agreement does not bind plaintiffs, thus triggering the doctrine of issue preclusion. The Court then considers the arguments on the merits.

### i.  *Issue preclusion*

"[T]he doctrine of issue preclusion, or collateral estoppel, protects the finality of judgments by 'precluding relitigation in a second suit of claims actually litigated and determined in the first suit.'" *Laguna Hermosa Corp. v. United States*, 671 F.3d 1284, 1288 (Fed. Cir. 2012) (quoting *In re Freeman*, 30 F.3d 1459, 1465 (Fed. Cir. 1994)) (alterations omitted). "The underlying rationale of the doctrine of issue preclusion is that a party who has litigated an issue and lost should be bound by that decision and cannot demand that the issue be decided over again." *In re Freeman*, 30 F.3d at 1465.

Except when resolving procedural issues not within this Court's exclusive jurisdiction, the law of the relevant regional circuit must be applied. *Dana v. E.S. Originals, Inc.*, 342 F.3d 1320, 1323 (Fed. Cir. 2003) (citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 807 (Fed. Cir. 1999)). Because plaintiffs assert that defendant's arguments are precluded by the *Fletcher* litigation in the Tenth Circuit, the Court applies the Tenth Circuit's law of issue preclusion. In that circuit, issue preclusion has four elements:

> (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

*Moss v. Kopp*, 559 F.3d 1155, 1161 (10th Cir. 2009) (citing *Frandsen v. Westinghouse Corp.*, 46 F.3d 975, 978 (10th Cir. 1995)). Ordinarily, the party invoking issue preclusion must show that all four elements are satisfied. *See, e.g., Stan Lee Media, Inc. v. Walt Disney Co.*, 774 F.3d 1292, 1297–98 (10th Cir. 2014).

The Court concludes that issue preclusion does not apply because plaintiffs fail to meet the first element. Plaintiffs argue that the government litigated whether headright owners are bound by the 2011 Agreement in the *Fletcher* district court, and lost. Not so. There, the federal government argued that "plaintiffs are bound by the Osage Nation's purported waiver [in the 2011 Settlement Agreement] of their *accounting* rights." *Fletcher 2015*, 153 F. Supp. 3d at 1368

10

(emphasis added). The district court disagreed, holding that federal law "grants both the Osage Nation and the headright owners the right to an accounting of funds," and "nothing" in federal law or the Osage Constitution "gives the tribe authority to waive the individual accounting rights of the headright owners." *Id.* In contrast, the issue presented here is whether the 2011 Agreement bars plaintiffs' *damages* claim for breach of fiduciary duties. The *Fletcher* district court had no occasion to decide that issue, and in fact did not do so.

Plaintiffs argue that the issue before the district court was whether the 2011 Agreement bound plaintiffs, period. That is incorrect. The district court's opinion mentions the Osage Nation's authority to bind plaintiffs four times, and each time expressly mentions accounting rights as well. *Id.* It would be unfair to preclude litigation over the issue presented here—the Osage Nation's authority to settle, waive, or release plaintiffs' claims for damages—when the district court did not address the issue and the government had no "incentive to fully litigate [it]." *Shell Petroleum, Inc. v. United States*, 319 F.3d 1334, 1339 (Fed. Cir. 2003). Therefore, the Court declines to apply issue preclusion here.

> ii.  *Plaintiffs are bound by the 2011 settlement agreement because they adopted the agreement*

Turning to the merits, the government argues that plaintiffs are bound by the Agreement because "the Osage Nation, acting through Osage Minerals Council" possessed actual authority to settle plaintiffs' claims on their behalf. The government presents two arguments in support of its position. First, that the Minerals Council is empowered by the Osage Constitution to speak for Osage headright holders on trust-fund matters. Second, plaintiffs' actions show that they authorized the Osage Nation to act on their behalf while entering the 2011 Agreement specifically. The Court rejects the first argument but agrees with the second.

"A settlement agreement is a contract." *Haggart v. United States*, 131 Fed. Cl. 628, 639 (2017) (citing *Slattery v. Dep't of Justice*, 590 F.3d 1345, 1349 (Fed. Cir. 2010)). Where, as here, the federal government is a party, the settlement agreement, "like any contract with the federal government[,] is governed by federal common law." *Moore v. United States Dep't of State*, 351 F. Supp. 3d 76, 88 (D.D.C. 2019); *see also Dice v. Akron, C. & Y. R. Co.*, 342 U.S. 359, 361 (1952).[5] To determine what the federal common law of contracts requires, the Court may look to general contract principles. *See A. Stucki Co. v. Worthington Indus., Inc.*, 849 F.2d 593, 596 (Fed. Cir. 1988); *see also Franconia Assocs. v. United States*, 536 U.S. 129, 141 (2002). Under the general law, a nonsignatory to a contract is bound by its terms if "an agent acting with actual or apparent authority makes [the] contract on behalf of" the nonsignatory party. Restatement (Third) Of Agency § 6.01 (A.L.I. 2006); *see Moody v. United States*, 931 F.3d 1136, 1141 (Fed. Cir. 2019).

The Court concludes, firstly, that neither the Osage Nation nor any branch of its government has authority under the Osage Constitution to bind Osage headright holders on matters relating to the Trust Account. Although defendant is correct that the Minerals Council is "elected by Osage headright holders and represent[s] and protect[s] the headright holders' interests," Reply 15, the Osage Constitution expressly states that the "sole purpose" of the

---

5   The parties have not argued that the law of another state or territory applies.

Minerals Council is to "administer and develop the Osage Mineral Estate"—with no authority to manage the Trust Account.  Osage Const. art. XV § 5; *accord Fletcher 2015*, 153 F. Supp. 3d at 1368.  And it is even less plausible that Osage headright holders may be bound by some other branch or agency of the Osage government, such as the Osage Congress or the Principal Chief, because all other Osage offices are elected by *enrolled* Osage citizens, with no input from un-enrolled Osage headright holders.  Osage Const. arts. VI, VII.  Therefore, the Court concludes that nothing in the Osage Constitution authorizes the Osage Nation to bind Osage headright holders on matters relating to the federal government's management of Osage trust funds.

That said, the Court finds that the conduct of Osage headright holders during and after the *Osage* litigation—which ended with the execution of the 2011 Agreement—shows that they authorized the Nation to litigate and settle that case on their behalf.  To be sure, headright holders (including Mr. Fletcher) did not authorize the Nation to act on their behalf at first.  For example, they attempted to intervene in *Osage* on the basis that the Nation does not represent their interests.  *Osage 2008*, 85 Fed. Cl. at 167.

However, after our Court denied the motion to intervene as a matter of right, the headright holders did not appeal, even though such denial "is a final judgment and immediately appealable."  *Wolfsen Land & Cattle Co. v. Pac. Coast Fed'n of Fishermen's Ass'ns*, 695 F.3d 1310, 1314 (Fed. Cir. 2012) (*citing Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 377 (1987)).

From that point onward, the headright holders' conduct began to evince a clear understanding that they would be bound by the settlement agreement.  Before executing the Agreement—which awards $345,800,000.00 to headright holders but also purports to release their pre-settlement claims, *see* Section III.A.1, *supra*—the Osage negotiation team presented it for approval to the Osage Nation Congress, the Principal Chief, and the Minerals Council.  Relevant here, the Minerals Council transmitted materials and conducted meetings to explain the contents of the Agreement to Osage headright holders.  *See* Resolution of the Osage Minerals Council 2, ECF No. 30-1 ex. 3.  The Council then conducted a referendum, in which "a majority of the voting Osage Headright interests agree[d] that the proposed settlement should be approved."  *Id.*  The Council then approved the Agreement with seven councilmembers in favor and one opposed.  *Id.*  Based on these facts, which plaintiffs have not disputed, the Court concludes that Osage headright holders were on notice that the Osage Nation was releasing claims on their behalf.

Finally, all Osage headright holders, regardless of whether or how they voted in the referendum, adopted the settlement when they "accept[ed] the benefits of th[e] contract"—$345,800,000.00 in total—without registering an objection, even though the contract conditioned the benefits on the curtailment of their legal rights.  28 Am. Jur. 2d Estoppel and Waiver § 60 (2025); *Janowsky v. United States*, 133 F.3d 888, 891 (Fed. Cir. 1998).  Plaintiffs argue that their lack of objection should not be held against them because, in e-mail correspondence, the federal government's counsel "refused to comment on what legal effect, if any, the settlement agreement would have [on their] breach of trust claims."  Resp. 31.  Plaintiffs appear to have read the government counsel's silence to mean that "the settlement agreement was [not] intended to impact this case," *id.*, but that inference was not warranted.  Careful lawyers often decline to

12

speculate about the legal content of documents; in such circumstances, it is incumbent on opposing counsel to protect their clients' rights—here, by objecting to the settlement. Plaintiffs did not object, and the Court therefore must conclude that they authorized the Nation to release their pre-settlement claims.

### B. The Court Need Not Decide whether Claim Preclusion Applies

The government also argues that plaintiffs' pre-settlement claims are barred by the doctrine of claim preclusion. Having concluded that plaintiffs' pre-settlement claims were released under the 2011 Agreement, the Court need not decide how claim preclusion applies in this context.

### C. This Suit Can Proceed without the Osage Nation

The Court now considers whether this case must be dismissed because the Osage Nation is a required party that cannot be joined due to tribal sovereign immunity. R. Ct. Fed. Cl. 12(b)(7), 19. The parties have briefed the issue as to both pre-settlement and post-settlement claims. However, having already concluded that the pre-settlement claims are barred by the 2011 Agreement, the only remaining question is how Rule 19 applies to the post-settlement claims. The Court concludes that as to post-settlement claims, the Osage Nation is not a required party that must be joined under RCFC 19(a)(1).

Under RCFC 19, courts must first identify whether an absent party is a "[r]equired [p]arty" that must be joined. *Id.* 19(a)(1). "[A] person . . . must be joined [if] . . . that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

   (i)   as a practical matter impair or impede the person's ability to protect the interest; or
   (ii)  leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest."

*Id.* 19(a)(1)(B). If the party must be joined, and joinder is not feasible (as here), "the court must determine whether, in equity and good conscience, the action should proceed . . . ." *Id.* 19(b).

The government argues that the Nation "has at least four interests" that may be impaired or impeded per RCFC 19(a)(1)(B)(i). Def.'s Suppl. Br. 5. First, it points out that the Nation is a trust beneficiary. *Id.* That may be true, but in the 2011 Agreement, the Osage Nation waived its right to bring post-settlement claims (which the Agreement calls "Future Trust Fund Mismanagement Claims") arising out of any quarterly statement provided by the federal government if the Nation "does not present an objection in writing to the Department of the Interior" within two years after the quarterly period at issue or one year after the statement is received, whichever is later. Agreement 17. The only exceptions are "claims of fraud or gross negligence" and claims brought in response to the federal government's failure to abide by the terms of the Agreement. *Id.* Plaintiffs have not alleged fraud or gross negligence, and the federal government has not asserted that it has breached the 2011 Agreement. Therefore, there is

13

no basis to think that the Osage Nation claims an interest in the resolution of plaintiffs' post-settlement claims.

Second, the government asserts that the Nation has an interest in this action as a "joint administrator" of the Trust Account. Def.'s Suppl. Br. 5. The Osage Nation, the government explains, is charged with authorizing "in coordination with Interior—the very transactions that [p]laintiffs challenge in this lawsuit, including payment of gross production taxes, tribal operating expenses, and quarterly headright payments, which include accrued interest." *Id.* Assuming without deciding that the Nation's administrative role is an "interest," the government fails to show that the Nation's non-participation would "as a practical matter impair or impede" that interest.

The Nation's administrative duties are in service of its constitutional duty to "ensure the rights of [Osage headright holders] to income derived from the Mineral Estate are protected." Osage Const. art. XV § 4. As a result, whether as trust beneficiary or a guardian of plaintiffs' right to a share of the trust funds, the Nation has no legal or practical interest in defending federal administrative decisions that shrink the size of the corpus. Therefore, should plaintiffs succeed in proving that the federal government overpaid state taxes or under-collected interest, the Nation would not be impaired.

Plaintiffs' claims regarding the government's treatment of tribal operating expenses present a closer question, but the government still falls short of the required showing. While the Nation may be impaired by a decision that *reduces* deductions for tribal operating expenses, plaintiffs have alleged that the federal government "erred in *reporting* expenses and simply adjusted the revenue so as to balance the account." Compl. 25 (emphasis added). The Nation has no legally cognizable interest in the misreporting of tribal expenses, whatever their amount. Therefore, the Nation's administrative duties do not transform it into a required party.

Third, the government asserts that the Nation has a "legal interest in how the United States' trust obligations under the 1906 Act are defined." Def.'s Suppl. Br. 5. Even if cognizable, that legal interest too would not be impaired or impeded by this litigation. To be sure, this Court has previously said that tribes suffer a harm by the mere possibility that a "negative" decision of this Court "could ripen into binding adverse precedent were this court's ruling affirmed by the Federal Circuit." *Klamath Tribe Claims Comm. v. United States*, 106 Fed. Cl. 87, 95–96 (2012). However, in this suit, the Federal Circuit has left open the possibility that the government does not owe identical duties to the Nation and headright holders under the 1906 Act. *See Fletcher 2022*, 126 F.4th at 1323. Even if this Court were to take a narrow view of the "nature and scope of the trust duties owed to headright holders" and the Federal Circuit were to affirm, Def.'s Suppl. Br. 6, the Nation will remain free to argue in a future suit that the government owes more duties to the Nation than to headright holders.

Finally, the government points to the Nation's financial rights to receive "tribal operating expense payments," and "headright payments" arising from the Nation's direct ownership of a small number of headrights. *Id.* at 5. The Court has already explained that plaintiffs have alleged misreporting, not overpayment, of tribal expenses. As for headright payments, plaintiffs—or the class of plaintiffs, assuming that one is certified—are only entitled to payments

14

for injuries they themselves suffered. Provided that plaintiffs and the United States do not attempt to settle the claims of headright owners not within the class (such as the Nation), the Nation's headright interest will not be impaired as a practical matter. Therefore, the Court concludes that the Osage Nation does not have any "interest relating to the subject of the action" that this litigation "as a practical matter may impair or impede." R. Ct. Fed. Cl. 19(a)(1)(B)(i).

* * *

The government also invokes RCFC 19(a)(1)(B)(ii), which requires joinder when a non-party's absence creates "a substantial risk" to a party "of incurring double, multiple, or otherwise inconsistent obligations." *Id.* 19(a)(1)(B)(ii). The government argues that it faces such a risk because plaintiffs and the Nation "assert overlapping and conflicting interests" in the Trust Account. Mot. Dismiss 23.

The Court is not convinced. First consider the plaintiffs' and the Nation's concurrent interests in the Trust Account. The government fears that after this suit concludes, the Nation may "attempt to initiate its own litigation against the United States, subject to the terms of the 2011 Settlement Agreement, challenging the same alleged mismanagement at issue here." *Id.* at 23–24. That may well happen, but there is no substantial risk of multiple recoveries because the United States will remain free to argue that the judgment or settlement in this case fully discharged a portion of the United States' liability to the Nation, in proportion to the share of the headrights owned by plaintiffs (or a class of plaintiffs) who participated in this case. For example, if the plaintiffs (or class of plaintiffs) in this case own half the headrights, the United States could argue that the Nation is only entitled to recover (the other) half of the damages proven.[6]

Turning to plaintiffs' and the Nation's conflicting interests in the Trust Account, the government suggests that it would be subject to inconsistent obligations if the Nation brings a claim for underpayment of tribal expenses after this Court awards damages or approves a settlement agreement as to plaintiffs' claims. But the government's hypothetical involves a breach of two separate duties: the duty to pay expenses to the Nation in the correct amount, and the duty to accurately report how much the Nation was paid. The breach of multiple duties may properly require multiple recoveries.

Thus, the government has failed to show that it would be burdened with multiple or inconsistent obligations in the absence of the Osage Nation per RCFC 19(a)(1)(B)(ii).

Having rejected both grounds proffered by the government for a Rule 19 dismissal, this Court holds that the Osage Nation is not a required party that must be joined in this case. Furthermore, the Court concludes that even if the Nation's alleged interests passed muster under RCFC 19(a), the lawsuit can proceed under Rules 19(b). *See* R. Ct. Fed. Cl. 19(b)(2) (counseling against dismissal if the eventual judgment can be tailored to "lessen[] or avoid[]" "any prejudice"); *id.* 19(b)(4) (counseling against dismissal when plaintiffs lack an adequate alternative remedy).

---

6          Additionally, the Nation may be able to recover damages for breach of any duties owed only to the Nation.

15

### D. The Complaint Is Adequately Pled, and the United States Is Not Entitled to a More Definite Statement of the Allegations

Lastly, the government argues that plaintiffs' claims should be dismissed for failure to identify specific fiduciary duties breached by the government, or, alternatively, that the Court should direct plaintiffs to file a more definite statement of the allegations. The Court concludes that plaintiffs have adequately pled their claims and that a more definite statement is not necessary.

To survive a motion to dismiss for failure to state a claim, a plaintiff need only allege facts that "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Inter-Tribal Council of Arizona, Inc. v. United States*, 956 F.3d 1328, 1338 (Fed. Cir. 2020). The purpose of the requirement is to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. The Complaint easily meets that standard. Plaintiffs have alleged that the government mismanaged funds in the Trust Account; given examples of the specific alleged lapses giving rise to their claim (such as overpayment of state taxes); and further identified the accounting that provides a basis for their case. Compl. 17, 23–24. Furthermore, given that defendant has litigated its fiduciary duties relating to the Trust Account for over two decades, the Court finds it improbable that defendant lacks notice of the specific fiduciary duties implicated in this suit. To the extent that the government seeks greater clarity, the proper remedy "is discovery, not a more definite statement." *Brinkman v. United States*, 158 Fed. Cl. 282, 294 (2022).

### IV. Conclusion

For the reasons discussed above, the defendant's motion to dismiss, ECF No. 30, is **GRANTED IN PART** and **DENIED IN PART** as follows: The motion to dismiss plaintiffs' pre-settlement claims under Rule 12(b)(6) is **GRANTED**; the motion to dismiss all counts under Rules 12(b)(7) and 19 is **DENIED**; and the motion requesting either dismissal for inadequate pleading under Rule 12(b)(6), or an order directing plaintiffs to file a more definite statement under Rule 12(e), is **DENIED**. There being no just reason for delay, the Clerk of Court is directed to enter partial judgment accordingly.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*
Loren A. Smith,
Senior Judge